Jason Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
J. Thomas Brett (Bar No. 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Phone: (916) 202-3018

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA  90012
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association,<br><br>    Plaintiff,<br><br>   v.<br><br>PACIFIC SINTERED METALS, INC., a California corporation; PSM INDUSTRIES, INC., a California corporation,<br><br>    Defendants. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.   This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.   On November 15, 2023, LA Waterkeeper issued a 60-day notice letter ("Notice Letter"), to the registered agent for service of process (40 C.F.R. § 135.2(a)(2)) for Pacific Sintered Metals, Inc., and PSM Industries, Inc. (hereafter "Pacific Sintered" or "Defendants"), as the owners and operators of the Facility under its control. Plaintiff also served the Notice Letter on Defendants' Chief Financial Officers and Chief Executive Officers, Susan Paullin and Craig Paullin, respectively.

3.   The Notice Letter informed Defendants of their violations of California's Storm Water Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No*. 2014-0057-DWQ) and amended by Order No. 2015-0122-DWQ and incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Loads ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereafter the "Storm Water Permit") and the Clean Water Act at the industrial facility located at 14000 Avalon Blvd., Los Angeles, CA 90061 with Waste Discharger Identification Number ("WDID") 4 19I011230 (hereafter, the "Facility").

4.   The Notice Letter informed Defendants of Plaintiff's intent to file suit

1   against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2        5.     The Notice Letter was also sent to the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

        6.     More than sixty (60) days have passed since both the Notice Letter was served on the Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

        7.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

        8.     Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.    INTRODUCTION

        9.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as receiving waters, are ecologically sensitive areas. Although

pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that those surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the receiving waters.

10.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

11.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert

1  witness fees, for Defendants' substantive and procedural violations of the Storm Water

2  Permit and the Clean Water Act resulting from Defendants' operations at the Facility.[1]

3      12.    Plaintiff specifically alleges violations regarding Defendants' discharge of

4  pollutants from the Facility into waters of the United States; violations of the monitoring,

5  reporting, and best management practice requirements; and violations of other procedural

6  and substantive requirements of the Storm Water Permit and the Clean Water Act, are

7  ongoing and continuous.

8  **III.**    **PARTIES**

9      **A.**    **Los Angeles Waterkeeper**

10      13.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation

11  organized under the laws of the State of California. LA Waterkeeper maintains an office

12  at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

13      14.    LA Waterkeeper's members live and/or recreate in and around Los Angeles

14  area. LA Waterkeeper is dedicated to the preservation, protection, and defense of the

15  environment, wildlife, and natural resources of local surface waters, including but not

16  limited to, Compton Creek, the Los Angeles River, the Los Angeles River Estuary /

17  Queensway Bay, the Dominguez Channel, the Dominguez Channel Estuary, Los

18  Angeles/Long Beach Inner and Outer Harbors, San Pedro Bay, and the Pacific Ocean. To

19  further these goals, LA Waterkeeper actively seeks federal and state agency

20  implementation of the Clean Water Act and, where necessary, directly initiates

21  enforcement actions on behalf of itself and others.

22      15.    LA Waterkeeper members work and reside in Los Angeles County, and they

23  use and enjoy Compton Creek, the Los Angeles River, the Los Angeles River Estuary,

24  Queensway Bay, the Dominguez Channel, the Dominguez Channel Estuary, Los

25  Angeles/Long Beach Inner and Outer Harbors, San Pedro Bay, and the Pacific Ocean,

26

27

28

---

[1] The Facility is fully described in Section V below.

Complaint for Declaratory and Injunctive    5
and Civil Penalties Relief

(collectively the "Receiving Waters"),[2] as well as the bordering parks, pathways, and golf courses, athletic fields, and beaches.

16.     Defendants' discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in Compton Creek, the Los Angeles River, the Los Angeles River Estuary, Queensway Bay, the Dominguez Channel, the Dominguez Channel Estuary, Los Angeles/Long Beach Inner and Outer Harbors, San Pedro Bay, and the Pacific Ocean, and impair LA Waterkeeper's members use and enjoyment of those waters.

17.     Pacific Sintered discharges pollutants into the Receiving Waters in violation of the Clean Water Act and the Storm Water Permit. LA Waterkeeper members also use and enjoy the Receiving Waters and other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. Additionally, LA Waterkeeper members use the Receiving Waters to engage in scientific study through pollution and habitat monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into the Receiving Waters impairs LA Waterkeeper's members' use and enjoyment of these waters. The unlawful discharge of pollutants from the Facility requires LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility. Thus, the interests of LA Waterkeeper and its members have been, are being, and will continue to be adversely affected by Pacific Sintered's failure to comply with the Clean Water Act and the General Permit.

18.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendants' discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

---

[2] The Storm Water Pollution Prevention Plan for the Facility lists TMDLs for the Los Angeles River, Dominguez Channel, and Torrance Carson Channel as applicable to storm water discharges from the Facility.

Complaint for Declaratory and Injunctive     6
and Civil Penalties Relief

19.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

20.     The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

### B.     The Owners and/or Operators of the Facility

21.     Plaintiff is informed and believes, and thereon alleges, that Defendant Pacific Sintered Metals, Inc. is an active California corporation that maintains its headquarters at 14000 Avalon Blvd., Los Angeles, CA 90061.

22.     Plaintiff is informed and believes, and thereon alleges, that Defendant PSM Industries, Inc. is an active California corporation that maintains its headquarters at 14000 Avalon Blvd., Los Angeles, CA 90061.

23.     Plaintiff is informed and believes, and thereon alleges, that Pacific Sintered Metals, Inc. is a subsidiary corporation of PSM Industries, Inc.

24.     Plaintiff is informed and believes, and thereon alleges, that Pacific Sintered Metals, Inc. and/or PSM Industries is the owner and/or operator of the Facility.

25.     Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Pacific Sintered Metals, Inc. and PSM Industries, Inc. is Craig Paullin, 14000 Avalon Blvd., Los Angeles, CA 90061.

26.     LA Waterkeeper refers to Defendants Pacific Sintered Metals, Inc., PSM Industries, and its management herein as the "Owners/Operators" of the Facility.

## IV.     STATUTORY BACKGROUND

### A.     The Clean Water Act

27.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a)

Complaint for Declaratory and Injunctive     7
and Civil Penalties Relief

prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

29.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

30.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342.; *see* 40 C.F.R. § 122.26(c)(1).

31.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

32.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

33.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well,

discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

34.    "Navigable waters" means "Waters of the United States." 33 U.S.C. § 1362(7); 33 CFR § 328.3.

35.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

36.    The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

37.    An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

38.    Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after December 20, 2015 commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects Pacific Sintered to a penalty of up to $64,618 per day per violation.

39.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

### B.    California's Storm Water Permit

40.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water

dischargers. *See id.*

41.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

42.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

43.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

44.     On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ.* Storm Water Permit, Section I(A) (Finding 4).

45.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance

Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

46.    On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

47.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

## C.    The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

48.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

49.    Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

50. Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

51. Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Section V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

52. The 2015 Multi-Sector Permit parameter Benchmarks, among others, are as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0021 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—0.47 mg/L; selenium—0.005 mg/L; and silver—0.0032 mg/L.[3]

53. The EPA's most recent, 2021 Multi-Sector Permit parameter Benchmarks for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; lead—0.082 mg/L; cadmium—0.0018 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; nickel—0.47 mg/L; selenium—0.0031 mg/L; and silver—0.0032 mg/L.

54. The Storm Water Permit contains Numeric Action Levels ("NALs") that

---

[3] The 2015 and 2021 Multi-Sector Permit parameter Benchmarks for cadmium, nickel, silver, and zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed herein is based on a hardness of 100 mg/L.

generally mirror the 2008 EPA Benchmark Values. *See* Storm Water Permit, Section I(M)(Finding 62).  Annual NALs, not accounting for water hardness, for the following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; cadmium—0.0053 mg/L;  N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—1.02 mg/L; selenium—0.005 mg/L; and silver—0.0183 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. *Id*.

55.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Stormwater Permit Section XII.A.

56.     Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

57.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

58.     Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

59.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

60. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

61. The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-29.

62. The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Angeles River and its watershed.

63. The Basin Plan specifies potential and existing beneficial uses for the Compton Creek including ground water recharge, warm freshwater habitat, wildlife habitat, and wetland habitat.  The Basin Plan specifies potential and existing beneficial uses for Reaches 1 and 2 of the Los Angeles River including, ground water recharge and warm freshwater habitat. The Basin Plan specifies potential and existing beneficial uses for the Dominguez Channel including, rare, threatened, or endangered species. The Basin Plan specifies potential and existing beneficial uses for the Dominguez Channel Estuary including, estuarine habitat, marine habitat, wildlife habitat, rare, threatened, or endangered species, migration of aquatic organisms, spawning, reproduction, and/or early development. Basin Plan, Table 2-1.

64. Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

65. The Dominguez Channel is impaired for indicator bacteria, zinc, copper, toxicity, and lead; the 2024 draft amendments to the 303(d) list for this waterbody, furthermore, proposes to add aluminum to the impairments list.

66. The Dominguez Channel Estuary is impaired for Benzo(a)anthracene, Benzo(a)pyrene, Chlordane (tissue), Chrysene (C1-C4), DDT (tissue & sediment), Lead, PCBs (Polychlorinated biphenyls), Phenanthrene, Pyrene, Toxicity, Benthic Community Effects, Copper, Dieldrin (tissue), and Indicator Bacteria. The 2024 draft amendments to the 303(d) list for this waterbody, furthermore, proposes to add Zinc.

67. As described below, a portion of the Facility (the Roof Drainage Area) discharges into the Dominguez Channel and/or the Dominguez Channel Estuary.

68. Compton Creek is impaired for lead, trash, indicator bacteria, benthic community effects, copper, pH, and zinc; the 2024 draft amendments to the 303(d) list for this waterbody, furthermore, proposes to add aluminum to the impairments list.

69. As described below, a portion of the Facility (the Yard Drainage Area) discharges into Compton Creek.

70. In addition to Compton Creek, the Dominguez Channel, and the Dominguez Channel Estuary (described above), the following waterbodies are located downstream from where the Facility discharges and are impaired for the following:

Reach 2 of the Lose Angeles River is impaired for Indicator Bacteria, Trash, Copper, Lead, Ammonia, Nutrients (Algae), Oil. It has been proposed in the Draft California 2024 Integrated Report that Reach 2 will also be listed for O&G and zinc;

Reach 1 of the Los Angeles River is impaired for copper (dissolved), cadmium, ammonia, zinc (dissolved), pH, cyanide, nutrients (algae), indicator bacteria, trash, and lead. It has been proposed in the Draft California 2024 Integrated Report that Reach 1 will also be listed for aluminum, bifenthrin, cyfluthrin, cypermethrin, deltamethrin, fipronil, imidacloprid, iron, O&G, permethrin, profenofos, pyrethroids, and toxicity. It has also been proposed that cadmium be delisted;

The Los Angeles River Estuary (Queensway Bay) is impaired for chlordane, PCBs (Polychlorinated biphenyls) (sediment), trash, DDT, and toxicity. It has been proposed in the Draft California 2024 Integrated Report these waters will also be listed for copper, indicator bacteria, dissolved oxygen, and zinc;

San Pedro Bay Near / Offshore Zones is impaired for total DDT, PCBs, toxicity, and chlordane. It has been proposed in the Draft California 2024 Integrated Report that San Pedro Bay will also be listed for copper, DDE, and DDT;

The Los Angeles Harbor – Consolidated Slip is impaired for Cadmium (sediment), Chlordane (tissue & sediment), Chromium, Copper (sediment), DDT (tissue & sediment), Dieldrin, Lead (sediment), Mercury (sediment), PCBs (tissue & sediment), Toxaphene (tissue), Zinc (sediment), 2-Methylnaphthalene, Benthic Community Effects, Benzo(a)pyrene, Chrysene (C1-C4), Phenanthrene, Pyrene, Toxicity, and Benzo(a)anthracene. It has also been proposed in the Draft California 2024 Integrated Report that the Los Angeles Harbor – Consolidated Slip be listed for dissolved oxygen and DDE;

The Los Angeles/Long Beach Inner Harbor is impaired for DDT, benthic community effects, PCBs, copper, toxicity, chrysene (C1-C4), benzo(a)pyrene, and zinc. It has also been proposed in the Draft California 2024 Integrated Report that the Los Angeles/Long Beach Inner Harbor be listed for silver, DDD, and DDE;

The Los Angeles/Long Beach Outer Harbor is impaired for PCBs, DDT, and Toxicity. It has also been proposed in the Draft California 2024 Integrated Report that the Los Angeles/Long Beach Outer Harbor be listed for chlordane and copper.

71.     The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

72.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38. The CTR sets forth lower numeric limits for zinc and other pollutants. The CTR

establishes a numeric limit for at least the following pollutants thought to be discharged by Pacific Sintered: cadmium – 0.0043 mg/L (freshwater), 0.042 mg/L (saltwater); nickel – 0.47 mg/L (freshwater), 0.074 mg/L (saltwater); copper – 0.013 mg/L (freshwater), 0.0048 mg/L (saltwater); zinc – 0.12 mg/L (freshwater), 0.09 (saltwater); and lead – 0.065 mg/L (freshwater), 0.21 mg/L (saltwater).[4,5]

73.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

74.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. *See* Storm Water Permit, Section VI(A).

**D.     The Storm Water Permit's Numeric Effluent Limitations**

75.     Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Los Angeles River and its tributaries include nitrogen and metals. (Storm Water Permit,

---

[4] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Attachment H at 18.

[5] LA Waterkeeper lists both the freshwater and saltwater CTR limitations and EPA benchmarks due to the uncertainty regarding where stormwater runoff from the Facility's Roof Drainage area discharges, the Dominguez Channel, which is freshwater, or the Domingez Channel Estuary, which is saltwater. As described below, LA Waterkeeper alleges in the alternative that stormwater runoff from the Roof Drainage Area of the Facility discharges to the Dominguez Channel and/or to the Dominguez Channel Estuary. To the extent that the Facility discharges to the Dominguez Channel, the freshwater CTR and EPA benchmark will apply. To the extent that the Facility discharges to the Dominguez Channel Estuary, the saltwater CTR and EPA benchmark will apply.

Attachment E, Table E-1).

76.     NELs applicable to Compton Creek (as a tributary to the Los Angeles River) include: lead—0.094 mg/L; copper—0.06749 mg/L; zinc—0.159 mg/L; cadmium—0.0031 mg/L; and N+N—8.0 mg/L. See General Permit, Attachment E. TNALs applicable to the Dominguez Channel include: lead—0.12288 mg/L; copper—0.20751 mg/L; and zinc—0.89887 mg/L. See General Permit, Attachment E.

77.     An exceedance of an NEL constitutes a violation of the General Permit. General Permit, Attachment C at 5. An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. *Id*.

**E.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

78.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

79.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map

indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

80.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

81.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

82.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J)

(Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

### F.     The Storm Water Permit's Monitoring Implementation Program Requirements

83.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)–(D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

84.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

85.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*.

86.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

87.     Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be

revised as necessary to ensure compliance with the Storm Water Permit.

88.    Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

89.    Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

90.    The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit, Section XI(B)(4).

91.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

92.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

93.    Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or

approved TMDLs, and additional parameters required by the Regional Water Board.

94.     All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 3499, Fabricated Metal Products, not elsewhere classified. Under SIC Code 3499, Pacific Sintered is also required to sample storm water for iron, aluminum, zinc, and N+N. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6) When self-reporting storm water sample results, Defendant samples for those pollutants listed above in this paragraph.

95.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

### G.    Exceedance Response Action Requirements

96.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

97.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the

SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit Section XII(C)(1)(a)-(c).

98.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

99.    Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

100.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

101.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

102.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D).

103.   A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, Storm Water Permit, Section XII(D).

## V.   STATEMENT OF FACTS

### A.   Pacific Sintered Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

104.   Defendant operates an industrial facility located at 1400 Avalon Blvd., Los Angeles CA 90061, located approximately 1.2 miles to the west of Compton Creek and approximately 3.1 miles to the north of the Dominguez Channel.

105.   The Facility's SWPPP, last updated in July 2020, ("Facility SWPPP"), states that the Facility is approximately 3.3 acres with a warehouse / office building that encompassed approximately 70,700 square feet. The SWPPP also indicates 77% of the site is impervious and 2.5 acres of industrial activities at the Facility are directly exposed to precipitation and storm water runoff.[6] The Facility's operating hours are Monday through Friday from 8 AM to 5 PM.

106.   The Facility's primary industrial purpose is the production of specialty engineered sintered and cast metal products utilizing powder metallurgy techniques. Powder metals undergo various processes including blending/mixing, additions of lubricants / binders, molding, compaction, sintering, followed by secondary applications such as coining, deburring, heat treating, plating, infiltrating, and machining etc. Powders are generally brass, bronze, iron, stainless steel, which are mixed with lubricating agents and graphite prior to the sintering process.

---

[6] The Facility's NOI estimation of areas exposed to storm water differs slightly from the Facility SWPPP. The NOI states that "128694.75 Acres" are exposed to storm water. Presumably, the 128694.75 figure refers to square feet rather than acres; 128,694.75 square feet is approximately 2.95 acres.

Complaint for Declaratory and Injunctive   24
and Civil Penalties Relief

107.   Industrial activities at the Pacific Sintered Facility include indoor production, outdoor materials storage, shipping / receiving, equipment operation and maintenance, and waste handling and storage.

108.   Plaintiff is informed and believes, and thereon alleges, that industrial activities at the site, many of them conducted outdoors and exposed to storm water include, but are not limited to:

Indoor Production - Metal product manufacturing processes including blending/mixing, additions of lubricants/binders), molding, compaction, and sintering, followed by secondary applications such as coining, deburring, heat treating, plating, infiltrating, machining, etc. are conducted indoors and not directly exposed to stormwater. Equipment (forklift) use and waste generation and other pollutants generated from indoor production activities have the potential to be tracked outdoors.

Outdoor Materials Storage – The facility utilizes The facility utilizes several outdoor storage areas located in the northeast and southeast corners of the site. Two large nitrogen tanks are located on the northeast corner of the site and along the northeast side of the warehouse building. In the northeast corner of the site are a propane tank cage for storage of small forklift fuel tanks, storage of waste bins for general refuse, pallet storage, and a hazardous materials storage area under a partially covered canopy and separated by a 6-inch high concrete berm. In the southeast corner of the site are a metal baghouse dust collector system, several air compressors stored under a covered canopy, and various equipment and parts storage.

Shipping Receiving - Materials transferred can include raw materials (powdered metals, lubricants, oils, etc.), intermediate products, finished products, and waste materials (pallets, metal dust, scrap metals, hazardous waste, and general refuse). Metal baghouse dust collection is located in the southeastern corner of the facility. All other materials transfer is conducted in the northeastern portion of the Facility.

Equipment Operation and Maintenance - Equipment utilized at the facility includes the forklifts, production equipment and machinery, and any other miscellaneous equipment used throughout the facility. Equipment maintenance and cleaning is conducted indoors and not exposed to stormwater. Equipment has the potential to leak and expose pollutants to storm water if proper preventative maintenance activities are not performed. Mobile equipment like the forklifts may also generate tire dust on outdoor

surfaces which can be exposed to storm water.

Waste Handling and Storage - General refuse waste dumpsters, used pallets, and other scrap equipment are located in the northern area of the site near the shipping/receiving docks. Hazardous waste including waste oil, alar solid filter cake waste, and baghouse dust waste are stored indoors or under cover within the hazardous materials storage area.

109.    Pollutants of concern from the industrial areas and activities described in the previous paragraph include O&G, pH, TSS, N+N, iron, zinc, aluminum, copper, lead, cadmium, and nickel. These pollutants are subject to tracking to other areas of the Facility, and offsite of the Facility, by employees, transfer of industrial materials between work areas and warehouses, loading and unloading of industrial materials, vehicle and forklift traffic, and use of heavy industrial equipment. These areas of industrial activity generate and release pollutants at the Facility which are discharged in storm water, including O&G, pH, TSS, N+N, nitrate, nitrite, iron, zinc, aluminum, copper, lead, cadmium, and nickel.

110.    Metal shavings, chips, dust and particulates, and chemical sediment from the industrial activities at the Facility can accumulate around the Facility. Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water.

111.    The Facility SWPPP also lists iron, lead, and copper in its pollutant source assessment.

112.    The Facility is comprised of three drainage areas the: Yard Drainage Area, Roof Drainage Area, and the Non-Industrial Drainage Area.

113.    The Yard Drainage Area conveys stormwater flows toward the north to a low point on the northeast corner of the site before discharging offsite as sheet flow towards East 139th Street, and before ultimately discharging into Compton Creek. Compton Creek is tributary to the Los Angeles River, which discharges to the Pacific Ocean.

114.    The Roof Drainage Area includes the warehouse building roof area and

hazardous materials storage area. All stormwater flows from the rooftop area through downspouts and towards the southeast corner of the site where it co-mingles with run-on from the eastern adjacent property before collecting in the drainage culvert along the southern property boundary that discharges towards Avalon Boulevard and ultimately towards the Dominguez Channel and/or the Dominguez Channel Estuary. The Dominguez Channel is tributary to the Dominguez Channel Estuary, which ultimately discharges to the Pacific Ocean.

115.   LA Waterkeeper is informed and believes that the Roof Drainage Area of the Facility discharges to the Dominguez Channel Estuary; the Facility SWPPP, however, notes that the Roof Drainage Area discharges to the Dominguez Channel. LA Waterkeeper alleges in the alternative that stormwater runoff from the Roof Drainage Area discharges to the Dominguez Channel and/or to the Dominguez Channel Estuary.

116.   According to the Facility SWPPP, the Non-Industrial Drainage area, conveys water from the employee parking lot and landscaped areas of the Facility, where the runoff "largely infiltrates into the grassy lawn. No samples are collected as this drainage area is non-industrial."

117.   Per the Facility SWPPP, the Facility has implemented the following advanced BMPs: two canopies installed above hazardous materials storage and air compressor storage areas, a 6-inch high concrete berm separating hazardous materials storage areas from the Facility parking lot, and Filtrexx Envirosoxx rolls, designed to remove metals, suspended solids, and oil and grease, placed in the Yard Drainage Area on the north side of the property.

118.   The Receiving Waters, including, *inter alia,* Compton Creek, the Dominguez Channel, the Dominguez Channel Estuary, the Los Aneles River, and the Pacific Ocean are waters of the United States, and which, upon information and belief, receive stormwater discharges from the Facility.

### B.   The Facility Storm Water Permit Coverage

119.   SMARTS lists the current Facility WDID number for the Facility as 4

19I011230 and coverage under the Storm Water Permit as "Active."

120.   The NOI for the Facility lists the Receiving Water as "Compton Creek LA River"; the Facility SWPPP, however, also indicates that the Facility discharges to the Dominguez Channel and Plaintiff is informed and believes, and alleges thereon, that the Facility discharges to the Dominguez Channel Estuary.

121.   Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in July 2020.

122.   Plaintiff is informed and believes, and thereon alleges, that Pacific Sintered has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least November 15, 2018. Pacific Sintered has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

123.   The Facility SWPPP, furthermore, fails to include a site map as required by Section X.E of the General Permit.

124.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the Storm Water Permit.

125.   Plaintiff is informed and believes, and thereon alleges, that Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

126.   Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: O&G, pH, TSS, N+N, iron, zinc, aluminum, copper, lead, cadmium, and nickel.

127.   Plaintiff is informed and believes, and thereon alleges, that Pacific Sintered has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management

requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. Storm Water Permit, Sections X(H)(1)(a)–(g).

128.    Plaintiff is informed and believes, and thereon alleges, that Pacific Sintered has further failed to implement sufficient advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the Storm Water Permit's effluent limitations. Storm Water Permit, Section X(H)(2).

129.    Plaintiff is informed and believes, and thereon alleges, that there are also insufficient minimum BMPs implemented, such as good housekeeping.

130.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least November 15, 2018.

131.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges containing excess levels of O&G, pH, TSS, N+N, iron, zinc, aluminum, copper, lead, cadmium, and nickel occur each time storm water discharges from the Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

132.    Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

133.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of

1   practices.

2   134.   Plaintiff is informed and believes, and thereon alleges, that pollutants,

3   including but not limited to those referenced herein, have been and continue to be tracked

4   throughout the Facility's operation areas.

5   135.   Plaintiff is informed and believes, and thereon alleges, that the

6   Owners'/Operators' failure to properly address pollutant sources and pollutants results in

7   the exposure of pollutants associated with its industrial activities to precipitation, and that

8   this results in discharges of polluted storm water from the Facility and into local

9   waterways in violation of the Storm Water Permit and/or the CWA.

10   136.   Plaintiff is informed and believes, and thereon alleges, that the

11   Owners'/Operators' failure to properly address these pollutants and its sources results in

12   the exposure of pollutants to precipitation, which carries these pollutants with storm

13   water flows from the Facility into the Receiving Waters.

14   **C.   Storm Water Discharges from the Facility**

15   137.   As discussed above and as detailed in the Facility SWPPP, storm water flow

16   within the Yard Drainage Area is conveyed toward the north to a low point on the

17   northeast corner of the site before discharging offsite as sheet flow towards East 139th

18   Street, and before ultimately discharging into Compton Creek and the Los Angeles River

19   and Pacific Ocean downstream. Storm water flow within the Roof Drainage Area

20   ultimately collects in the drainage culvert along the southern property boundary that

21   discharges towards Avalon Boulevard and ultimately towards the Dominguez Channel

22   and/or the Dominguez Channel Estuary and the Pacific Ocean downstream.

23   138.   Plaintiff is informed and believes, and thereon alleges, that Pacific Sintered

24   has self-reported NAL exceedances from the Facility over the past five (5) reporting

25   years.

26   **D.   The Facility's Storm Water Discharges to the Receiving Waters Contain**
27   **Elevated Levels of Pollutants**

28   139.   Plaintiff is informed and believes, and thereon alleges, that pollutants from

the Facility discharge with storm water to the Domingues Channel and/or the Dominguez Channel Estuary, and ultimately to the Pacific Ocean.

140.    Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water to Compton Creek, then to the Los Angeles River and ultimately to the Pacific Ocean.

141.    Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows to Compton Creek, the Los Angeles River, Domingues Channel and/or the Dominguez Channel Estuary, and the Pacific Ocean, all waters of the United States.

142.    Storm water discharges containing pollutants including, but not limited to, heavy metals such as iron, zinc, aluminum, copper, lead, cadmium, and nickel adversely affect the aquatic environment.

143.    Samples of storm water discharges collected at the Facility contain pollutants including copper and zinc in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

144.    Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event[7] – or any other storm water or non-storm water discharge – that has occurred at the Facility since November 15, 2018 through the present, Defendants have discharged and continue to discharge storm water and non-

---

[7] Dates of significant rain events are measured at the Los Angeles International Airport, CA US USW00023174 station based on data recorded by NOAA. A significant rain event is defined by EPA as a rainfall event generating 0.1 inches or more of rainfall, which generally results in discharges at a typical industrial facility. Here, Plaintiff is informed and believes that the Facility discharged pollutant-laden storm water on at least 102 significant rain events from November 15, 2018 to November 15, 2023, including discharges in excess of applicable NELs, as measured by this rain gauge. The NOAA rain data from this rain gauge is attached hereto as **Attachment A** to **Exhibit A**.

storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

### E.   Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements

145.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

146.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

147.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

148.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

149.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

150.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

151.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report

any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

152.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

153.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to collect storm water samples during QSEs.

154.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have failed and continue to fail to collect storm water samples from the required number of QSEs.

155.   Information available to Plaintiff is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

156.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to submit accurate Annual Reports to the Regional Board for the past five reporting years in violation of Section XVI of the Storm Water Permit.

157.   According to a Level 2 ERA Technical Report submitted by the Facility in July, 2019, the Facility was in Level 1 for TSS, aluminum, iron, and N+N, and ERA Level 2 for copper and zinc at the beginning of the 2019 reporting year.

158.   Plaintiff is informed and believes, and thereon alleges, that the Facility continued to experience average NAL exceedances for copper and zinc in the 2019-2020 and 2020-2021 Reporting Years, again triggering ERA Level 2 for those constituents.

159.   Plaintiff is informed and believes, and thereon alleges, that since 2019, the Owners/Operators have failed to submit an ERA Level 2 action plan or technical report, or revise the SWPPP accordingly, in violation of the General Permit.

160.   Plaintiff is informed and believes, and thereon alleges, that the

Owners/Operators have failed to analyze stormwater samples for lead despite the fact that it is listed in the Facility SWPPP's pollutant source assessment in violation of the General Permit. General Permit Section XI.B.6.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

161. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

162. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

163. Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* Storm Water Permit, Sections I(D)(Finding 32)V(A); 33 U.S.C. § 1311(b).

164. The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

165. Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

166. Each day, since at least November 15, 2018, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a

separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

167.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 15, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

168.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

169.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

170.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

172.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable Basin Plan, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

173.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels

of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

174.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

175.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

176.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 15, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

177.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

178.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

179.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

180.   Plaintiff is informed and believes, and thereon alleges, that the

Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

181. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

182. Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

183. The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from November 15, 2018, to the present.

184. The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

185. The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

186. Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

187. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 15, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

188. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

189. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring and Reporting Plan in Violation of**
**the Storm Water Permit and the Clean Water Act.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

190.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

191.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

192.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

193.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

194.    The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from November 15, 2018 to the present.

195.    The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

196.    The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

197.    Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

198.    By committing the acts and omissions alleged above, the Owners/Operators

are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 15, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

199.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

200.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

201.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

202.   Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

203.   The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. *See* Storm Water Permit, Section XX(B).

204.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

205.   Further, Defendant have repeatedly failed to submit required ERA Level 2 technical reports and/or action plans, despite entering into and/or remaining in that level for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

206.   The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least November 15, 2018.

207.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

208.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 15, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

209.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and

omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

210.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

211.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring Defendants to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.   A Court order enjoining Defendants from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.   A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $64,618 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.   Any other relief as this Court may deem appropriate.

Dated: January 19, 2024                    Respectfully submitted,


                                           */s/* Jason R. Flanders
                                           Jason R. Flanders
                                           James T. Brett
                                           AQUA TERRA AERIS LAW GROUP
                                           Attorneys for Plaintiff
                                           LOS ANGELES WATERKEEPER